IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br>BRIAN CHRISTOPHER YORKS,<br><br>Respondent,<br><br>and<br>OLYMPIA GEORGIANNA YORKS,<br><br>Appellant. | No. 87699-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — This is the second appeal of a parenting plan entered after the dissolution trial of Brian Yorks and Gina Bloom.[1] The trial court initially entered a parenting plan that awarded Yorks decision-making authority and most of the residential time. Bloom appealed, resulting in an opinion by this court remanding to the trial court to make additional findings and to strike a provision regarding the parties' right to file complaints with Child Protective Services (CPS) and law enforcement. After remand, the original trial judge recused, and the case was reassigned to a successor judge. Over Bloom's objection, the successor judge entered additional findings to satisfy the mandate from this court's opinion in the first appeal. Bloom now appeals those findings.

We hold that the successor court did not abuse its discretion by entering the findings without conducting a new trial. It had authority to do so and entered findings that addressed the issues we previously remanded to the trial court based on an

---

[1] In her brief, Olympia Georgianna Yorks uses the name "Gina Bloom." Accordingly, we use this name to refer to her in this opinion.

independent and impartial review of the existing record. Therefore, we affirm. We also deny Bloom's request for attorney fees on appeal.

## BACKGROUND

Yorks and Bloom married in 2008 and separated on February 14, 2020.[2] They have two children together.[3] After a five-and-a-half-day dissolution trial, on July 14, 2022, the trial court dissolved the marriage and entered a parenting plan, in which the court granted Yorks sole decision-making and found that Bloom (a) had a long-term emotional or physical problem interfering with her ability to parent and (b) engaged in an abusive use of conflict. Based on former RCW 26.09.191(1) and (2)(a) (2021), the trial court restricted Bloom's decision-making authority and residential time with the children.[4] Further, in an oral ruling, the court found that Yorks committed "acts of domestic violence" against Bloom.[5] However, the parenting plan stated both that "neither parent has" engaged in domestic violence and that "Yorks has a history of Domestic Violence against the mother."[6]

In her first appeal of the parenting plan, Bloom argued that the court erred on several grounds. In our opinion, we remanded to strike a provision "regarding the parties' rights to file complaints with CPS and law enforcement, and to make additional findings, as permitted by the record as it currently exists, consistent with" the directives in the opinion. See Yorks v. Yorks, No. 84480-6-I, slip op. at 17 (Wash. Ct. App. Feb. 26, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/844806.pdf. We further

---

[2] See Yorks v. Yorks, No. 84480-6-I, slip op. at 1 (Wash. Ct. App. Feb. 26, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/844806.pdf.
[3] Id.
[4] Yorks, No. 84480-6-I, slip op. at 2-3.
[5] Id. at 3.
[6] Id.

ordered that "if those additional findings result in substantive changes to the residential time, decision-making, or other provisions of the plan, the court will need to modify and make consistent related provisions of the parenting plan arising from those new findings." Id. The mandate from the appeal was filed with the superior court on June 26, 2024.

The judge who oversaw the original trial (predecessor judge) recused himself, as initially communicated by email to the parties in November 2023. Subsequently, the predecessor judge sua sponte entered an order of recusal,[7] and the case was administratively reassigned to another judge (successor judge).

On August 1, 2024, Bloom filed a motion requesting the successor judge grant "a new trial on a new Final Parenting Plan, based on the evidence at the time of the new trial, and complying with the directives of the Court of Appeals in its Opinion." She argued that a new trial was necessary because "a successor judge lacks authority to enter findings of fact on the basis of testimony heard by a predecessor judge." Yorks opposed a new trial, contending that the successor judge was capable of making the "limited" findings on remand on the basis of the existing trial record.

---

[7] The predecessor judge entered a written "Order of Recusal" on July 12, 2024, stating among other things that "a brief procedural recitation is necessary to explain why this order is necessary." Bloom then requested that the court amend the order "to correct factual errors and exclude certain findings of fact on grounds of fairness" to her. On November 27, 2024, after the case had already been reassigned to the successor judge, the predecessor judge issued an "Amended Order of Recusal" superseding the prior order of recusal, stating in full only the following:

> In an effort to expedit[e] this case being heard and resolved this order will enter, the undersigned [predecessor judge] received additional information, at a date after the trial and active in court proceedings, outside the record, that it appeared recusal was then mandated by the code, so as to avoid any appearance of fairness issue, the scope of the mandate appears clear, this case will be transferred administratively, for further proceedings.

On August 13, 2024, the parties appeared before the successor judge. The successor judge agreed she needed to review the entirety of the trial transcript and the admitted exhibits before she could determine whether a new trial was necessary.[8]

On November 14, 2024, the successor judge entered "Additional Findings of Fact and Order Following Remand." Bloom filed a motion for reconsideration and/or CR 52(b) motion to amend the findings to "explicitly state the basis for the successor judge's authority to enter new findings, rather than relying on the erroneous assertion that [Bloom] or her counsel agreed to forgo a new trial." On December 17, 2024, the successor judge denied the motion to reconsider, clarifying that "independent of any agreement[ by the parties], it finds that it has the authority to proceed in the manner that it did." Further, as to Bloom's claim that the court erred by not allowing her to submit a proposed parenting plan, proposed findings and conclusions, or arguments as to the remand issues, the court disagreed, noting, "Neither party was ever authorized or invited to provide the Court with proposed findings. There is nothing in the appellate decision that suggests such a procedure." Although, the successor court denied the motion for reconsideration, it granted the motion to amend. On February 7, 2025, the successor court issued "Amended Additional Findings of Fact and Order Following Remand." Bloom timely appealed both the successor court's November 14, 2024,

---

[8] Regarding Bloom's motion, the court stated,

I am largely not ruling on your motion to address the scope of any new trial, because I think that is premature and dependent on whether or not the Court can follow the Court of Appeals' directive without having to weigh into credibility issues and other matters that would run afoul of the Crosetto court's ruling [in In re Marriage of Crosetto, 101 Wn. App. 89, 1 P.3d 1180 (2000)]. So some of this, we're going to have to play it by ear once I have reviewed all of the materials. And you will have ample time to provide us with a proposed parenting plan.

Additional Findings of Fact and Order Following Remand and the order denying her motion for reconsideration.

During the pendency of this appeal, Yorks sought relocation to Texas with the children. Bloom objected to the relocation, but the parties eventually agreed to an order granting relocation and a new final parenting plan (New Parenting Plan). The agreed order incorporates the court's "Amended Additional Findings of Fact and Order Following Remand" that are the subject of this appeal.[9]

## DISCUSSION

Bloom argues that the successor judge erred by entering additional findings of fact in the order following the initial remand. She contends that, generally, party consent is necessary for a successor judge to make additional findings, and even if party consent is not necessary, the findings were dependent on credibility determinations, which a successor judge lacks authority to make. Bloom also argues the trial court erred when it denied her motion for reconsideration, she requests a new trial that permits current evidence, and she requests fees on appeal.

I. Mootness

As a preliminary matter, Yorks requests this court to dismiss the appeal as moot due to the agreed New Parenting Plan. "A case is moot when it involves only abstract propositions or questions, the substantial questions in the trial court no longer exist, or a

---

[9] Concerning limitations on the parents' residential time, the New Parenting Plan stated:

The court makes the following findings about the comparative risk of harm to the children posed by each parent, including any decision not to impose limitations or not to prioritize limitations:
See "Amended Additional Findings of Fact and Order Following Remand" filed February 7, 2025, attached and fully incorporated herein by this reference.

5

court can no longer provide effective relief." Spokane Rsch. & Def. Fund v. City of Spokane, 155 Wn.2d 89, 99, 117 P.3d 1117 (2005). Mootness is a question of law reviewed de novo. Ctr. for Biological Diversity v. Dep't of Fish & Wildlife, 14 Wn. App. 2d 945, 985, 474 P.3d 1107 (2020).

Yorks argues that by agreeing to the terms of the New Parenting Plan, "which expressly incorporates the Amended Additional Findings, and agreeing that the new plan is in the best interests of the children, Bloom has waived any objections to, or alleged errors in, the findings themselves." Thus, he argues, this court cannot provide any meaningful relief, and the appeal is moot.

We disagree. If we conclude that Bloom prevails in this appeal, we would reverse the successor judge's findings and remand for additional findings, as the original plan lacked the mandatory findings to support Yorks's designation as the parent with more residential time. While there is a rebuttable presumption that the intended relocation will be permitted, this presumption does not apply if the person proposing relocation has substantially equal residential time. Former RCW 26.09.520 (2019), .525.[10] Moreover, one of the 11 factors a trial court must consider to determine whether to allow a relocation is "whether either parent or a person entitled to residential time with the child is subject to limitations under [former] RCW 26.09.191 [(2019)]." Former RCW 26.09.520(4) (2019).

The agreed relocation order did not make new findings to account for the deficiencies recognized in the original mandate. Instead, it merely adopted the successor judge's amended additional findings of fact and order following remand.

---

[10] This was the version of RCW 26.09.520(4) in effect at the time the trial court entered the agreed order on relocation and the New Parenting Plan.

Thus, the successor judge's findings at issue in this appeal—i.e., that Yorks "has a history of domestic violence" and Bloom "has engaged in ongoing and deliberate actions to misuse conflict"—provided the basis for the relocation order and the contemporaneous New Parenting Plan. Our resolution of this appeal can still provide effective relief, because reversing the successor judge's findings would impact the relocation order and parenting plan provisions on residential time and decision-making. Accordingly, we reach the merits of this appeal.

## II. Successor Court's Authority To Enter Additional Findings of Fact

Bloom contends that the "trial court erred in entering the 'Additional Findings of Fact and Order Following Remand' without holding a new trial" and also erred by denying her motion for reconsideration. The parties disagree as to whether the successor judge had authority to enter the additional findings of fact based on the evidence in the record before by the predecessor judge.

We review a successor judge's determination to make additional findings of fact for abuse of discretion. In re Marriage of Crosetto, 101 Wn. App. 89, 98, 1 P.3d 1180 (2000).[11] "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

"Generally, a successor judge lacks authority to enter findings of fact on the basis of testimony heard by a predecessor judge." Crosetto, 101 Wn. App. at 95. The

---

[11] Similarly, "[m]otions for reconsideration are addressed to the sound discretion of the trial court and a reviewing court will not reverse a trial court's ruling absent a showing of manifest abuse of discretion." Wilcox v. Lexington Eye Inst., 130 Wn. App. 234, 241, 122 P.3d 729 (2005). As both Bloom's appeal of the successor court's findings and its denial of her motion to reconsider raise the same argument that party consent was required, our analysis of the successor court's authority addresses both claims of error.

"[s]tatute and court rules contain similar provisions." Id. RCW 2.28.030(2) states that a judge "shall not act as such in a court . . . in any of the following cases," including "when he or she was not present and sitting as a member of the court at the hearing of a matter submitted for its decision." However, CR 63(b) contains an exception to the rule:

> If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if a new judge cannot perform those duties, the new judge has the discretion to grant a new trial.

" 'Taken together, the case law and [court] rules set forth the rule that a successor judge only has authority to do acts which do not require finding facts. Only the judge who has heard evidence has the authority to find facts.' " Crosetto, 101 Wn. App. at 96 (alteration in original) (quoting State v. Bryant, 65 Wn. App. 547, 550, 829 P.2d 209 (1992)). Nevertheless, parties may also agree to allow a successor judge to make findings of fact based upon the evidence in the record. Id.; see also State v. Ward, 182 Wn. App. 574, 586, 330 P.3d 203 (2014) (holding substitute judge "may sign findings of fact and conclusions of law based on another judge's ruling, when the parties do not object").

Bloom argues that here, the successor court's ruling "rested on a misreading of Crosetto, an improper expansion of *dicta* into rule, and an application of legal authority inconsistent with CR 63(b), RCW 2.28.030(2), and controlling precedent." We disagree.

In Crosetto, the court was asked to determine whether a new trial was warranted after remand to a successor judge following a prior appeal in a dissolution of a marriage with children. 101 Wn. App. at 94-95. The first appeal had "required the trial court on remand to determine the value of [the husband]'s business," as well as "whether the

8

record contained sufficient reasons to deviate downward from the child support schedule." Id. at 96. First, the court in Crosetto noted that while "generally, it would have been necessary for the successor judge to grant a new trial," "[t]he important difference" in that case was that the parties agreed to allow the successor judge to make findings of fact based on the evidence in the record from the first trial. Id. The court discussed decisions by courts in other jurisdictions, including decisions interpreting Federal Rule of Civil Procedure (Fed. R. Civ. P.) 63 (1991) (repealed 2007), which was at the time identical to CR 63(b) (1967) (repealed 2015), and determined that the case law "support[s] the conclusion that there is no necessity for a new trial where, as here, the parties agree to allow the successor judge to rely on the record." Id. at 98.[12]

However, while the Crosetto court did find it significant that the parties consented to the successor court making additional findings of fact, it did not, as Bloom argues, hold that party consent was required. Id. The Crosetto court noted that "the successor judge found it significant that there was no need for credibility determinations." Id. It reviewed court decisions interpreting Fed. R. Civ. P. 63 (1991) (repealed 2007) that "continued to recognize an exception for cases not involving credibility determinations"[13]

---

[12] The Crosetto court noted that the federal rule was subsequently amended in 1991 to "further clarif[y] the federal courts' position regarding the requirement of a new trial." 101 Wn. App. at 101 n.6. Both the 1991 and current version of Fed. R. Civ. P. 63 (which became effective December 1, 2007) specify that a successor judge may proceed "upon certifying familiarity with the record and determining that the case may be completed without prejudice to the parties" and that "[i]n a hearing or a nonjury trial, the successor judge must, at a party's request, recall any witness whose testimony is material and disputed and who is available to testify again without undue burden." Washington has not adopted either of these specific provisions; CR 63 remains substantively the same as the rule in effect in Crosetto after minor amendments in 2015. Compare CR 63 (1967) (repealed 2015) ("if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial") with CR 63 ("if a new judge cannot perform those duties, the new judge has the discretion to grant a new trial").

[13] Crosetto, 101 Wn. App. at 100 (citing Home Placement Serv. Inc. v. Providence Journal Co., 819 F.2d 1199, 1204 (1987); Henry A. Knott Co. v. Chesapeake & Potomac Tel. Co., 772 F.2d 78, 87 (4th Cir. 1985); Emerson Elec. Co. v. Gen. Elec. Co., 846 F.2d 1324, 1326 (11th Cir. 1988)).

and summarized, "[t]hese cases suggest that while the absence of credibility determinations alone is not a sufficient basis to deny a new trial, the court should balance fairness considerations with those of judicial economy." Id. at 101. Thus, the Crosetto court held that "because witness credibility was not at issue, a time-consuming, expensive retrial was not necessary to resolve the issues on remand; 'an independent and impartial review of the largely stipulated evidence contained in' the record was more than sufficient." Id. (quoting Home Placement Serv. Inc. v. Providence Journal Co., 819 F.2d 1199, 1204 (1st Cir. 1987)). Therefore, "[t]he successor judge did not abuse his discretion in following this procedure." Id.

Accordingly, we reject Bloom's suggestion that the Crosetto court's reference to "fairness and judicial economy" was *dicta* rather than a "generalized balancing test." "Dicta," an abbreviated form of "obiter dictum," refers to

> "an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination; any statement of the law enunciated by the court merely by way of illustration, argument, analogy, or suggestion."

State ex rel. Lemon v. Langlie, 45 Wn.2d 82, 89, 273 P.2d 464 (1954) (quoting Black's Law Dictionary 541 (4th ed. 1951)). As discussed, the Crosetto court's determination that the successor court did not abuse its discretion was based not only on party consent, but also on the absence of a credibility determination, as well as considerations of judicial economy—i.e., the fact that "a time-consuming, expensive retrial was not necessary to resolve the issues on remand"—and fairness—i.e., the sufficiency of "an independent and impartial review of the largely stipulated evidence." 101 Wn. App. at 101.

Therefore, here, the successor judge properly determined that under <u>Crosetto</u>, the parties' consent was not a prerequisite to its ability to make findings on remand without a new trial and, further, that based on considerations of fairness and judicial economy, a new trial was not needed. In the order denying Bloom's motion for reconsideration, the successor court explained the basis for its determination that it could proceed as it did and make additional factual findings:

> [P]ursuant to [<u>Crosetto</u>], and the federal cases cited therein, because the underlying findings were upheld, and the record contained additional evidence that established findings that did not require[] the need for a credibility determination, a new trial was not required.
>
> As to whether either party was prohibited from participating in the process, the Court of Appeals required this Court to make findings based on the trial record. . . . Following a trial, the parties are not generally asked to submit proposed findings; those are instead made by the Court following the presentation of evidence and argument. The time for the parties to make arguments about what is or is not supported by the record is during trial. This process was no different, except that the review was done from the paper record. Essentially, it was treated as a summary judgment.
>
> . . . .
>
> Although the court considered the additional factor of the parties' agreement, it was not a requirement.

The successor court further explained in its Amended Additional Findings of Fact and Order Following Remand as follows:

> When undertaking this case, this Court initially believed that the outcome might necessitate more changes to the parenting plan. However, after additional reviews of the narrow issues on remand, and a thorough review of the Court's oral findings, and the record, it became clear that substantive changes would not be warranted. Moreover, because of the extremely limited directives on remand, *judicial economy supports proceeding on the record rather than ordering a new trial.*
>
> As to the record itself, there was substantial testimony and other evidence in the trial record to address each of the remand issues. Both

parties were represented by experienced counsel at the trial and had ample opportunity to present their case and make argument to the Court. Neither party was deprived of an opportunity to address the issues before the court, and *a consideration of fairness in this case did not warrant a new trial*.

This Court has not considered or requested any proposed additional findings from the parties. To the extent that they may have been provided, the Court has reviewed the record independently, as it would have at the initial trial. Thus, the court considered the arguments of the parties made during the trial but did not request additional argument as there was nothing in the remand decision indicating that additional argument should be considered. The Court of Appeals was clear that the findings should be found in the record. In essence, the Court treated it as a summary judgment determination as set forth in Emerson Elec. Co. v. General Elec. Co., 846 F.2d 1324, 1326 (11th Cir. 1988).

(Emphasis added.)

The successor court in this case applied the correct legal standard. Therefore, the court did not engage in legal error under CR 63(b), RCW 2.28.030(2), or Crosetto.

## III. Successor Court's Additional Findings

The parties also dispute whether the successor court properly determined that the additional findings did not require credibility determinations, as well as the court's findings. The first appeal identified several issues for remand, two of which included requests for additional factfinding.[14] We conclude that on the record in this case, the court did not err by determining that neither required a credibility determination or by entering the additional findings.

---

[14] One of the issues also concerned a portion of the parenting plan that limited complaints to CPS or law enforcement, which this court held was an unconstitutional prior restraint and mandated that the section be struck from the future amended parenting plan. Yorks, No. 84480-6-I, slip op. at 13. The successor judge followed the directive and struck the provision from the final parenting plan. This action is not challenged on appeal and, thus, we conclude the trial court did not abuse its discretion when it followed this court's previous direction to strike the provision. Crosetto, 101 Wn. App. at 96 (" '[A] successor judge only has the authority to do acts which do not require findings of facts.' " (quoting Bryant, 65 Wn. App. at 550)).

12

"Credibility amounts to a threshold determination of plausibility that involves more than the demeanor of witnesses. A credibility determination includes an assessment of evidence in light of its rationality, internal consistency, consistency with other evidence, and common experience." In re Pers. Restraint of Clemens, 125 Wn. App. 634, 644 n.3, 106 P.3d 244 (2005) (citing Carbo v. United States, 314 F.2d 718, 749 (9th Cir. 1963)). Credibility is defined as "[t]he quality that makes something (as a witness or some evidence) worthy of belief." Black's Law Dictionary 463 (12th ed. 2024); see also Howell v. Spokane & Inland Empire Blood Bank, 117 Wn.2d 619, 626, 818 P.2d 1056 (1991) (in the context of a summary judgment motion, "[a]n issue of credibility is present only if the party opposing the summary judgment motion comes forward with evidence which contradicts or impeaches the movant's evidence on a material issue").

A "trial court's findings of fact will be accepted as verities by the reviewing court so long as they are supported by substantial evidence." In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the matter asserted." Id.

A.  Residential Time and Related Former RCW 26.09.191(2)(n) (2019) Finding

The predecessor trial court's order found that "both parents engaged in domestic violence, and, in its order clarifying its initial ruling, commented that '[t]his case presents the very difficult balancing that Trial Court's [sic] must engage in when both parents present with issues, some long term and debilitating, that interfere with their ability to currently parent." Yorks, No. 84480-6-I, slip op. at 4-5. "However, the trial court nowhere

expressly found that the children would be safe with [Yorks] and that his harmful conduct very likely would not reoccur, or that his conduct did not impact them." Id. at 5.

In the first appeal, Bloom contended that " 'the court did not make the required additional findings to allow [Yorks] to be the primary residential parent." Id. at 4. This court agreed. Id. It reasoned that ordinarily, a parent's residential time " 'shall be limited if it is found that the parent has engaged in,' among other things, 'a history of acts of domestic violence.' " Id. (quoting former RCW 26.09.191(2)(a)(iii) (2019)). However, a trial court may choose not to limit a parent's residential time if it " 'expressly finds' either that (i) the child will be safe with that parent and the probability the parent's harmful conduct will recur is so remote it is not in the child's best interests to apply a limitation, or (ii) the parent's conduct did not have an 'impact' on the child." Id. (quoting former RCW 26.09.191(2)(n) (2019)). Thus, the court remanded the matter "to the trial court to make express findings—if the current record before it allows—as to whether (i) the children would be safe with [Yorks] and there is no remote possibility he would commit domestic violence again, or (ii) the children were not impacted by the history of domestic violence." Id. at 6 (citing Caven v. Caven, 136 Wn.2d 800, 806, 966 P.2d 1247 (1998); former RCW 26.09.191(2)(n) (2019)).

On remand, the successor judge relied on the second option, former RCW 26.09.191(2)(n)(ii) (2019), and found that "Yorks' conduct, during acts of proven and alleged domestic violence toward [Bloom], did not have an impact on the children, based on the record before the court, and limitations on the father's residential time are therefore not mandated by statute." To support this finding, the court explained,

> In its oral decision, the trial court found that there was an admitted act of domestic violence in March 2016 against [ ] [Bloom]. This court

agrees. There is nothing to indicate that the children were present or aware of the incident, or any of the alleged incidents of physical violence. Moreover, there is nothing in the record to suggest that the children have been victims of domestic violence. [Bloom's] stated concerns at trial related primarily to Yorks' neglectfulness as a parent and she testified that she did not believe he would harm the children. This assertion is undisputed and is supported by the record, including by a friend of [Bloom] who believes [ ] Yorks is a terrible person who should not be a parent. Despite this belief, the friend testified that she had only seen [ ] Yorks yell once and that he had never been aggressive toward the children.

. . . .

It must be acknowledged that the children have been deeply impacted by the nature of their parents' relationship, including the loud and angry arguments they have heard between their mother and father, their mother and the neighbor, and their mother and her roommates, and the extremely contentious nature of the marital dissolution. While this court acknowledges the impact of domestic violence on children, even when the children are not the targets of the violence, there is no evidence in the trial record that either [child] . . . (who would have been 1 month old and 29 months old, respectively, at the time of the incident) were present, aware of, remember, or were impacted by the 2016 domestic violence incident. There was an allegation of sexual assault in 2020 that was not pursued.at trial for a finding of domestic violence. However, based on the brief information provided, the children were not aware of anything related to that incident either.

Bloom argues that because "the record . . . contains sharp factual disputes about the existence, nature, and impact of domestic violence, the credibility of the allegations against both parents, and the divergent testimony of the parties," "[t]he question of whether the children were impacted . . . could not be resolved without credibility determinations." As an initial matter, Bloom contends that the successor judge inappropriately focused only on the 2016 incident when discussing the issue and that in doing so, the successor judge resurrected an argument that had already been rejected in the first appeal, i.e., that the predecessor judge found only one incident, so it cannot support a determination that Yorks had a "history of acts of domestic violence." We agree with Bloom on this point. The successor court stated,

> Although there was testimony about additional allegations of Domestic Violence, the Court was not directed to make findings about those allegations. The court was only told to resolve whether, in light of the finding that a domestic violence incident occurred in 2016, limitations on [ ] Yorks' residential time were required.

However, in the prior appeal, we expressly rejected Yorks's contention that the predecessor court had found only a single incident, stating it was "simply factually inaccurate," as "[t]he court found that [Yorks] committed 'acts of domestic violence' against [Bloom]." Yorks, No. 84480-6-I, slip op. at 6 n.5.

Nevertheless, the record did not contain evidence requiring credibility determinations about whether the children were present during any of the domestic violence incidents and whether they were impacted by the events. Therefore, the successor court did not abuse its discretion when it found that the children were not impacted by Yorks's history of domestic violence.

Generally, the parties discussed the domestic violence and rape allegations but did not specifically dedicate much testimony to whether the children were impacted by the events. Bloom testified generally to the rape allegation, and she referenced a variety of other incidents that included alleged choking, pushing, shoving, and grabbing.

Yorks discussed only the 2016 incident, which resulted in his arrest, and he admitted to breaking a door to get to Bloom and taking her phone. However, Yorks generally denied other incidents of domestic violence and declined to speak about the rape allegation. Similarly, his testimony did not cover whether the children were present or explore whether the incident impacted the children.

When asked if Yorks was a danger to the children, Bloom responded he was "neglectful[] . . . yes, he was. But not abusive." Yorks's sister testified that Bloom

16

brought the children over shortly after the 2016 incident and that the youngest child was "under a year old." But at no point in Bloom's testimony did she reference the children witnessing the events, either the 2016 incident or the later incidents that she alleged and Yorks denied. However, Bloom discussed possible impacts on the children at least twice during her testimony. When asked if she disagreed with an assessment "that domestic violence does not affect children in a household as long as it's not directed at them," Bloom responded that she disagreed with that and elaborated that she believed "it does affect a lot. Like [she] said, a lot of times in [their] marriage, it got to the point, as the children got older and they were able to see more and hear more, I could see how it affected them tremendously." And Bloom agreed that it would be in the "best interest[s] of the children for [Yorks] to deal with his issues with domestic violence" through a domestic violence evaluation.

The guardian ad litem (GAL) assigned to the case discussed his investigation into the domestic violence and sexual assault allegations. After being asked about whether he recommended a domestic violence evaluation, the GAL stated

> I did not. And this was primarily based on [Bloom]'s very strong position that he wasn't a danger to the children. Now, keep in mind that I'm just the guardian ad litem to the children, and domestic violence between the parents does affect the kids, but in this unusual case, the parents agreed that it was not an issue and that it should not affect his parenting.

Thus, during the initial trial, while the parties disagreed over whether a domestic violence evaluation was necessary, they did not disagree on the specific issue as to which the successor court made an additional finding: whether under former RCW 26.09.191(2)(a)(iii) (2019) the children were "impacted by the history of domestic violence." While the successor court did improperly limit its analysis of the "history" to

17

the single 2016 incident, it "acknowledged that the children have been deeply impacted by the nature of their parents' relationship, including the loud and angry arguments they have heard between their mother and father, their mother and the neighbor, and their mother and her roommates, and the extremely contentious nature of the marital dissolution." However, the evidence of the impact on the children of the parents' contentious relationship—which could exist without domestic violence being present—is not the same as being impacted by domestic violence. As to that specific question, even considering Bloom's allegations of additional acts of domestic violence beyond the 2016 incident, there was no evidence that the children were present, that Yorks abused them directly, or that otherwise required a credibility determination as to whether they were impacted.

In sum, we conclude that the record did not contain evidence requiring credibility determinations and that substantial evidence—"evidence sufficient to persuade a fair-minded person," Katare, 175 Wn.2d at 35—justified the successor court finding that based on the existing trial record that the children were not impacted by a history of domestic violence and that "limitations on [ ] [Yorks'] residential time are therefore not mandated by statute."

B.  Primary Decision-Making

Second, Bloom contended in the first appeal that the court erred when it awarded primary decision-making to Yorks. Yorks, No. 84480-6-I, slip op. at 7. The predecessor court had "found 'limiting .191 factors as to' [Bloom] and, more specifically, that [Bloom] had 'engaged in conduct that could clearly be classified as domestic violence.' " Id. at 7. This court held that there were deficiencies with the court's order that required remand.

18

Id. at 8.[15] Upon reviewing the court's findings—or lack thereof—we reasoned that it was unclear "why the balance here favored [Yorks]" regarding primary decision-making, if both engaged in domestic violence or otherwise could have had limitations imposed. Id. at 9. Again, "the trial court, while mentioning that [Bloom] may have also committed domestic violence, did not say what conduct of [Bloom]'s constituted domestic violence (or the basis of her restrictions), or how it weighed it against [Yorks]'s conduct before designating [Yorks] the parent with primary decision-making authority." Id. Thus, we remanded "this matter for the trial court to clarify the basis of its restrictions on one party's decision-making authority, if such findings may be made on the record before it." Id.

On remand, the successor judge found that the finding of abusive use of conflict against Bloom was not challenged on appeal and thus could operate as "an independently sufficient basis to support the restrictions on [Bloom]'s residential time and decision-making authority." Indeed, during the first appeal, this court held that "the abusive use of conflict finding is an independently sufficient basis to support the

---

[15] The deficiencies were described as follows:

> First, to the extent that the court awarded [Yorks] decision-making authority because of [Bloom]'s history of domestic violence, the trial court does not make any finding as to which of [Bloom]'s behaviors or conduct constitutes an act(s) of domestic violence.
>  . . . .
> Second, none of the court's orders specify who the parent is, for purposes of restricting joint decision-making, who 'engaged in a history of acts of domestic violence.' It is simply unclear who is the 'parent with a history of acts of domestic violence' that justifies this restriction.
>
> Finally, the court indicated it was "balancing" a situation where "both parents present with issues, some long term and debilitating, that interfere with their ability to currently parent." But nowhere does the court explain why that balancing favored [Yorks].

Yorks, No. 84480-6-I, slip op. at 8 (citations omitted).

restrictions on her residential time and decision-making authority." Id. at 12. The successor judge recognized that this reasoning could "conflict[] with the directive to clarify the basis of [the predecessor judge's] restrictions" as it related to Bloom's alleged history of domestic violence, so she made five additional findings of "undisputed actions [that] warrant a limitation on [Bloom's] decision-making."

Here, the successor court did not abuse its discretion when it made the five additional findings based on the initial trial record because they did not require credibility determinations and substantial evidence supported each finding. First, the successor judge found that Bloom

> started a 'GoFundMe' page requesting funds for legal representation so that she could obtain 'justice' for herself and the children. On this page, she posted images of herself and her children with bruises or injuries that were obtained organically (i.e., not due to domestic violence), and asked people to help her protect herself and her kids from their abuser, who she named as Brian Yorks. While it appears clear that this page never directly stated that the bruises in the images were inflicted by Brian Yorks, it appears undisputed that the intent was that readers would make that assumption.

The GAL and Yorks confirmed the existence of the GoFundMe campaign, which Bloom did not dispute. When asked directly if Bloom used pictures of the children with bruises to indicate that Yorks "abused the children," she said she did not. However she did acknowledge that at least one of the photos within the campaign showed bruises obtained accidentally at a birthday party. Because no testimony disputed the creation of the campaign, it was not necessary to make a credibility determination to find it existed.

Second, the successor judge found that "[w]hen [ ] Yorks did not want his residential address disclosed to [Bloom], [Bloom] followed the children and the visitation supervisor in an attempt to learn his address. This resulted in all parties meeting in a

parking lot, and the police having to intervene. The children were present." The visitation supervisor testified to this event, as did Yorks. Bloom did not dispute the event.

> Third, the successor court found that Bloom

> [m]oved two separate individuals into her home on two separate occasions while the children were placed with her, without first conducting any background checks. These individuals were loud, disruptive, caused damage to property, and refused to leave when asked, causing [Bloom] to fear for herself and the children. Per her own testimony, after experiencing trouble with the first roommate, [Bloom] turned around and moved a second individual in, without first obtaining a background check, to the same results.

Bloom did not dispute that she allowed the two individuals to move in, she feared for herself, and she did not perform background checks on the individuals before they moved in. Thus, it appears no credibility determination was necessary to determine the action did happen.

> Fourth, the successor court found that Bloom

> [r]emoved [B.Y. from ]Yorks' home during [ ] Yorks' scheduled residential time without permission. At the time, [B.Y.] was home sick with [ ] Yorks' girlfriend, while [ ] Yorks was in small claims court. [Bloom] was aware that [ ] Yorks had a court obligation because she was also attending the hearing. [Bloom] observed [B.Y.] being cared for by [ ] Yorks' chosen adult, but physically removed [B.Y.] from the home, without shoes or proper clothing, to take him to the Emergency Room. Per [Bloom's] own report, [B.Y.] was crying while she removed him from the Father's home. [Bloom] kept [B.Y.] for 4 hours until [ ] Yorks drove to Seattle to pick him up. The medical report from the hospital demonstrated that he had no fever or need for emergency intervention.

Yorks testified that the morning of the incident, B.Y. "seemed okay" but "still had a slight temperature." Yorks confirmed that he was away that morning and left B.Y. with Julieta Gallardo, his girlfriend at the time. Gallardo testified to the incident, confirming that Bloom came to the home and took B.Y. despite him not showing any symptoms of

illness except for a mild fever. A friend who was with Bloom before she left to get B.Y. testified that Bloom did not attempt to call Yorks in her presence and that Bloom saw Yorks was in court that morning. Bloom did not dispute that she took B.Y. to the emergency room, but she did assert that she attempted to email Yorks before going to his home. Regardless, Bloom, Gallardo, and the GAL acknowledged that the day of the incident was during Yorks's residential time. The after-visit medical summary from the emergency room confirmed that B.Y.'s temperature was nearly normal.

Finally, the successor court found that Bloom had "made statements to the children that [ ] Yorks is a bad man and a horrible person." This finding is based on the following exchange between Bloom and Yorks's attorney:

> [Yorks's Attorney:]   Now, I believe you did testify earlier that the children are becoming more aware of this situation, correct?
>
> [Bloom:]   They were when we were together.
>
> [Yorks's Attorney:]   Okay. Is it partially because, as Dr. Brown[16] stated in her report, you made comments directly to the children that their daddy was a bad man, and made statements about what a horrible person he was?
>
> [Bloom:]   Some of those statements were made. That's correct. But a lot of those -- I know now -- I didn't then -- were made from reactive abuse, the things that would happen before.

Each of the successor court's findings on this issue concerned undisputed testimony establishing that the actions took place, with Bloom often corroborating the other testimony. Bloom argues that the "purpose, context, and reasons for her actions" are important and help diminish the impact of the actions or the probability of them recurring. However, as the successor judge appropriately highlighted, "an explanation of

---

[16] Dr. Monique Brown performed the court-ordered psychological evaluation of Bloom.

22

*why* an act was done does not affect whether the act actually happened." (Emphasis in original.)

As we recognized in the first appeal, the abusive use of conflict finding was an independently sufficient basis to support the restrictions on Bloom's residential time, and, as Bloom conceded at oral argument in that appeal, could not be re-litigated "on remand or in any future appeal." Yorks, No. 84480-6-I, slip op. at 12. Accordingly, the successor judge did not abuse her discretion when she utilized the abusive use of conflict finding to limit Bloom's residential time and decision-making authority. Furthermore, because none of the findings that support the abusive use of conflict determination required resolving credibility disputes, and there is substantial evidence sufficient to persuade a fair-minded person that each of the five events took place, the successor judge did not abuse her discretion when she made these additional findings after an independent and impartial review of the trial record.[17]

---

[17] Bloom further contends that "this Court should authorize the introduction of current evidence as necessary to adjudicate the remand issues," and "[l]imiting the proceeding to a frozen 2022 record would nullify the remedy this Court ordered but [she] was denied." However, a trial court's discretion on remand is "limited by scope of the appellate court's mandate." State v. Kilgore, 167 Wn.2d 28, 42, 216 P.3d 393 (2009). Because we conclude that the successor court did not abuse its discretion by making additional findings based on the existing trial record, a new trial is not required to comply with the mandate from our prior opinion.

Similarly, in Crosetto, the court cited, with approval, the successor court's explanation of why new testimony was not needed to fulfill the mandate on remand:

> THE COURT: . . . [A]ll of [the findings necessary to determine a child support deviation are] bound by the testimony in the record. This is not a modification. We wouldn't go back and take testimony on what the circumstances of the parties are now. That would be a modification. This is to review and make a determination [of] what the trial court should have entered back when this was tried in 1993. That's the directive from the Court of Appeals.

101 Wn. App. at 99.

IV.  Removal from Parenting Plan of Required Dispute Resolution

Bloom also argued during the first appeal that the trial court erred when it provided Yorks and her the option to resolve disagreements about the parenting plan with a mediator because it is " 'generally inappropriate in cases involving domestic violence.' " Yorks, No. 84480-6-I, slip op. at 10 (quoting RCW 26.09.016). We agreed and remanded for the trial court "to clarify its role in the future dispute resolution process, after considering whether it is still proper to order mediation following its findings of domestic violence." Id. at 11.

On remand, the successor judge adjusted the language within the final parenting plan so that Yorks and Bloom will go to court to resolve ongoing issues "without having to go to mediation, arbitration, or counseling."[18] Bloom does not dispute "that the successor judge's decision to eliminate the parenting plan's requirement for [alternative dispute resolution] was probably within her authority and consistent with governing law." Indeed, RCW 26.09.016 generally discourages courts from requiring mediation when there is a finding that a parent has engaged in a history of domestic violence, although the statute contemplates that a victim could request mediation and the court may make exceptions. Accordingly, the trial court did not abuse its discretion when it struck the requirement for mediation from the final parenting plan.

V.  Attorney Fees

Bloom requests attorney fees on appeal. RAP 18.1(a) contemplates that a party is entitled to a fee award on appeal if allowed by applicable law. "RCW 26.09.140 provides that '[u]pon any appeal, the appellate court may, in its discretion, order a party

---

[18] The court specified that "while the parties may always attend dispute resolution if they wish, it cannot be mandated by the Court."

to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs.' " In re Marriage of Chandola, 180 Wn.2d 632, 656, 327 P.3d 644 (2014) (quoting In re Marriage of Rideout, 150 Wn.2d 337, 357, 77 P.3d 1174 (2003)).

RAP 18.1(c) requires that "each party must serve upon the other and file a financial affidavit no later than 10 days prior to the date the case is set for oral argument." Bloom failed to file the necessary affidavit of financial need under RAP 18.1(c). Accordingly, we deny her request for fees on appeal.

CONCLUSION

We affirm.

_____
Chung, J.

WE CONCUR:

_____          _____
Coburn, J.